# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

STEPHANIE D. ODOM,       )
                         )
    **PLAINTIFF,**          )
                         )
**VS.**                   )        **CV04-CO-02363-S**
                         )
**JO ANNE B. BARNHART,**   )
**Commissioner of the Social**   )
**Security Administration,**     )
                         )
    **DEFENDANT.**        )

## MEMORANDUM OF DECISION

The Court has before it the July 29, 2005, motion (doc. #17) of defendant Jo Anne B. Barnhart for summary judgment.[1]  The motion was deemed submitted without oral argument.

### I. Procedural History

Plaintiff Stephanie Odom commenced this action on July 30, 2004, by filing a complaint in this Court against Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("SSA"), alleging (1) that the SSA violated the

---

[1] Defendant has styled her motion as a Motion to Dismiss, or Alternatively, for Summary Judgment.  However, because defendant does not make any arguments to dismiss strictly on the pleadings, as would be required by Fed. R. Civ. P. 12(b)(6), and because both parties have filed evidence, the court considers the motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) **MOOT**.

Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 et seq., by failing to accommodate her and treating her disparately because of her disability and (2) that the SSA violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., by wrongfully terminating her in retaliation for her requesting accommodations and filing Equal Employment Opportunity Commission ("EEOC") charges.  (See Compl.)  Defendant's July 29, 2005, motion for summary judgment asserts that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law.  (See generally Def.'s Mem. Supp. Summ. J.)

On July 29, 2005, defendant also filed a brief (doc. #19) and evidence[2] (doc. #18) in support of its motion for summary judgment.  Plaintiff filed a brief (doc. #20) and evidence[3] (doc. #21) in opposition to the motion on August 19, 2005.

---

[2] Defendant submitted the following evidence:  The administrative record from the Merit Systems Protection Board ("MSPB"); the MSPB appeal transcript; the deposition of Stephanie Odom; the deposition of James Cockrell; the deposition of Brenda Matt with exhibits; the deposition of Geraldine Locke with exhibits; the deposition of Leila Marcus Powers with exhibits; the administrative law judge's decision; a letter from plaintiff to her personnel file dated Dec. 24, 2003 regarding the Social Security Administration's treatment of her during her employment; and a letter from plaintiff to Brenda Matt, acting division head, dated April 1, 2002, requesting reassignment to another module.

[3] Plaintiff submitted the following evidence:  The affidavit of Stephanie Odom; the affidavit of Irene Jones; the Social Security Administration's report of investigation; a list of disabled Claims Authorizer Trainees; an e-mail from Brenda Matt about Stephanie Odom's training; the affidavit of Renee Zelickson; the deposition of Harold Naves; and e-mails from Irene Jones regarding Zelickson's mentor.

The court has considered all of the briefs and the evidence.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. Chapman, 229 F.3d at 1023;

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50.  The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial).  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.

4

Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

5

### III. Relevant Undisputed Facts[4]

Plaintiff Stephanie Odom has been diagnosed with spastic paraparesis,

which requires that she use a wheelchair at all times and also occasionally affects

her use of her fingers, hands, and arms.  (Odom v. Social Security Admin., No.

AT-0432-04-0295-I-1, at 2 (M.S.P.B. May 28, 2004) [hereinafter M.S.P.B.

Opinion]; Compl. ¶ 8.)  Plaintiff also has a learning disability, which has been

identified as a mathematics disorder.[5]  (Compl. ¶ 9.)  The Social Security

Administration ("SSA") appointed Odom to the position of Claims Authorizer

Trainee ("CAT"), GS-7, on or about August 13, 2000, based on a recommendation

from the Department of Vocational Rehabilitation under a special hiring authority

due to her mobility impairment.  (M.S.P.B. Opinion 2; Compl. ¶ 10.)  The

appointment required that Odom have a two-year probationary period with the

SSA.  (Marcus Aff.; Matt Dep. at 39.)  After she was appointed, Odom completed

approximately four months of formal classroom training from September 2000

through January 2001.  (M.S.P.B. Opinion 2; Odom Dep. at 43.)  Odom

successfully completed her training and was assigned to process division 4,

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the nonmoving party.  See Fitzpatrick, 2 F.3d at 1115.

[5] Plaintiff's learning disability was not identified and documented until July 2003. (Compl. ¶ 9.)

module 16.  (M.S.P.B. Opinion 2; Odom Dep. at 44.)  When she was initially

assigned to module 16, her manager was Betty Bradley.  (Odom Dep. at 44.)  Like

all new SSA employees, she was initially placed on 100 percent mentor review[6]

and was assigned a mentor in module 16.  (Matt Dep. at 39; Odom Dep. at 45.)

Her mentor was changed every few months at her supervisor's discretion, and she

had a number of different mentors during her tenure at the SSA.  (See Odom Dep.

at 45-51.)  Odom remained on 100 percent mentor review from the time she

finished her initial training until she was terminated.  (Admin. R. at 32; see also

M.S.P.B. Opinion 3.)  Her mentors consistently noted her need for improvement in

both the quality and quantity of her work on her monthly progress reports.  (See

generally Admin. R. at 53-219.)

In March 2001, after she had been at her post for about two months, Odom

informed the SSA, through its management, that she had a learning disability that

affected her ability to receive and process information.[7]  (Compl. ¶ 12.)  Because

---

[6] This apparently means that Odom's mentor reviewed all of the cases she worked on.
Trainees are subject to a lesser standard of review (i.e. 50 percent review) or are taken off review
as they progress in their jobs and are able to process their cases independently.  (See Matt Dep. at
39.)

[7] Plaintiff had no actual diagnosis or documented proof of her learning disability in
March 2001.  (Compl. ¶ 12.)  Her assessment that she had a learning disability was based on "her
own professional opinion since she has a Master of Arts in Education of the Learning Disabled."
(Id.)

of her learning disability, she requested that she be allowed to go through formal

training classes again, but that request was denied.  (Id.)  On or about August 13,

2001, the SSA withheld Odom's within-grade pay increase because of her poor job

performance.  (M.S.P.B. Opinion 3; Admin. R. at 32.)  Around October 2001,

Odom once again asked Bradley to allow her to retake the formal training course

because she felt her learning disability had interfered with her initial training.

(Compl. ¶ 13.)  Odom felt that her awareness of her learning disability, combined

with her experience on the job, would allow her to complete the course more

successfully the second time.  (Id.)  Bradley informed Odom that she was not

aware that employees could retake the formal training classes.  (Id.)  Subsequently,

around December 2001 or January 2002, Odom met with Nanette Roberts, the

operations manager of division 4, to discuss her job performance and how her

learning disability affected it.  (Compl. ¶ 14; Admin. R. at 185-87.)  They

discussed the possibilities of Odom's retaking training classes or being moved to

another position within the SSA.  (Admin. R. at 185-87.)  Roberts explained that

she could not make such decisions herself but would discuss Odom's case with

upper level management.  (Id.)  The SSA denied Odom's request for more formal

training, stating that it did not allow employees to retake the classes.  (Compl. ¶

14.)

On February 8, 2002, Odom met with Bradley and union representative George Post to discuss her job performance. (Admin. R. at 179-82; Odom Dep. at 109-10.) At that time, Odom was placed on a 90-day training improvement plan, which was to run through May 8, 2002. (Admin. R. at 179-82; M.S.P.B. Opinion 3.) The plan provided that if Odom did "not improve to the successful level in all areas by the end of the 90 day period (May 8, 2002) she may be removed from the Claims Authorizer Trainee position." (Admin. R. at 181.) The end date for the training improvement plan was subsequently extended to June 27, 2002. (M.S.P.B. Opinion 3.) Later in February or in March 2002, Leila Marcus (now Leila Marcus Powers) replaced Bradley as the manager supervising module 16. (Odom Dep. at 49; Powers Dep. at 10; Compl. ¶ 15.) Odom informed Marcus that she had a learning disability[8] and once again requested that she be allowed to repeat the training classes. (Compl. ¶ 15; Powers Dep. at 13-14.) Her request was once again denied. (Powers Dep. at 14.) However, in May 2002, Odom's mentor

---

[8] According to Marcus and Brenda Matt, who was the operations manager during part of the time Odom was assigned to module 16, Odom vacillated as to whether she had a learning disability and often stated that she did not have one when her supervisors would question her about it. (Powers Dep. at 13; Marcus Aff. 5; Matt Dep. at 17; Matt Aff. 3.) Irene Jones, Odom's union representative, testified, however, that Odom never professed not to have a learning disability in the meetings she attended. (Jones Aff. ¶ 11.) Because disputed facts are resolved in favor of the nonmoving party when considering a motion for summary judgment, the court will assume, without deciding, that Odom informed her supervisors that she had a learning disability that affected her ability to do her job.

at the time, James Cockrell, provided her with some informal one-on-one training for a three-week period.[9]  (Odom Dep. at 74; Marcus Aff. 6-7.)

Because of the significant improvement in her job performance during the period that Cockrell was her mentor,[10] Odom requested that he remain her mentor as long as she continued to be on mentor review.  (Compl. ¶ 19; see also Matt Dep. at 20-21; M.S.P.B. Opinion 3.)  Instead, she was transferred to another mentor because Cockrell was assigned to teach a class.  (Compl. ¶ 19.)  Odom maintains that Marcus purposefully had Cockrell teach the class so that he could no longer mentor her.  (Id.)  Odom felt that Marcus and Brenda Matt, the acting operations manager,[11] were "working against her" by not assigning her an appropriate mentor, not allowing her to retake formal training classes, and calling her progress with Cockrell an "anamoly."  (Compl. ¶ 19; Odom Dep. at 79-81; Cockrell Dep. at 25-26; Powers Dep. at 27-28.)  Odom claimed that Marcus' and Matt's behavior

---

[9] In addition to the more intensive training with Cockrell, Odom's various mentors provided one-on-one retraining for shorter periods on several different occasions in 2001 and 2002.  (See Marcus Aff. 6-7.)  One of her mentors, Pat Merritt, prepared special training packages for Odom that addressed the specific areas she needed assistance with.  (M.S.P.B. Tr. 46-47.)

[10] Cockrell was Odom's mentor from approximately May 2002 until August 2002.  (See M.S.P.B. Opinion 3.)

[11] Matt was the acting operations manager while Nanette Roberts was on detail at the SSA headquarters in Baltimore.  (Compl. ¶ 19; Matt Dep. at 12.)

toward her was causing stress that was exacerbating her medical condition, spastic paraparesis, and she asked to be transferred out of module 16 in the form of a Request for Reasonable Accommodation.  (Admin. R. at at 123-27.)  Her request was granted on October 18, 2002, and she was transferred to module 9.  (Compl. ¶ 20; Admin. R. at 123-27; M.S.P.B. Opinion 3.)  Her supervisor in module 9 was Geraldine Locke.  (Compl. ¶ 20; Locke Dep. at 11-12; M.S.P.B. Opinion 3.)  Despite the problems with her supervisors, Odom was granted a within-pay grade pay increase on October 6, 2002, although she remained on 100 percent mentor review.  (M.S.P.B. Opinion 3.)

In May 2003, Locke placed Odom on a Performance Assistance Plan ("PAP") because her job performance was still at an unsatisfactory level.  (Admin. R. at at 75-79.)  Odom and her union representative, Irene Jones, attended the meeting with Locke to develop the PAP, which was to run from May 6 until August 3, 2003.  (Id.)  On May 8, 2003, Odom submitted a Request for Reasonable Accommodation, asking that she have time taken off her "productive time"[12] for restroom visits since her "health conditions and inability to move quickly" required her to take longer than average restroom breaks.  (Admin. R. at

---

[12] "Productive time" apparently represents the number of hours per day that an SSA employee should be working on actual casework.

at 73-74.)  Specifically, Odom requested three twenty-minute breaks be taken off her productive time.  (Id.)  Locke denied this request, stating that Odom did not establish that her request was job-related or show that having productive time taken off for extra restroom breaks would help her perform the essential functions of her job.  (Admin. R. at at 66-67.)  Locke also pointed out that Odom's work station was already located as close to the restroom as possible.  (Id.)

On July 24, 2003, Odom submitted another Request for Reasonable Accommodation, which was supported by documentation from a psychologist that she had a learning disorder.[13]  In this Request, Odom asked for three accommodations:  (1) that she be given four days' administrative leave to attend a vocational training seminar designed to teach mathematics disorder coping skills, (2) that she be allowed to retake the formal training class for claims authorizers and to tape record the sessions, and (3) that she be provided with DRAGON software, a voice recognition word processing system, because her spastic paraparesis was affecting her hands and her ability to type.  (Admin. R. at 50-51; Compl. ¶ 26.)  The first two requests were denied because Odom did not provide "information on how these training activities would address [her] limitations in

---

[13] The Learning Disability Assessment from the psychologist indicated that Odom had a learning disability in math and that her mathematical abilities were approximately on a 5th or 6th grade level.  (Admin. R. at 65.)

math and enable [her] to successfully perform the computational duties required of a [claims authorizer]." (Admin. R. at 38.) Her request for DRAGON software was not immediately denied; instead, the SSA requested further information documenting her condition's effect on her hands and arms. (Id.) After further documentation was submitted on October 30, 2003, the request for DRAGON software was denied because the supporting documentation "did not show a connection between the disability and the work problem that needs to be accommodated." (Admin. R. at 526.) In other words, the SSA claimed that Odom failed to show that her condition substantially inhibited her ability to type. (See id.)

On August 12, 2003, Odom, Jones, and Locke met to develop a Performance Enhancement Plan ("PEP") because Odom's PAP had expired without her reaching the required level of improvement. (Admin. R. at 551-53.) The PEP was also a 90-day plan, effective from August 18 through November 15, 2003. (Id.) On November 18, 2003, at the conclusion of her PEP, Locke notified Odom that she was recommending that she be removed from her position because of her poor job performance. (Admin. R. at 515-25.) Odom did not respond to the notice, and on December 16, 2003, the SSA issued a decision letter removing Odom for unacceptable performance, effective December 29, 2003. (M.S.P.B.

13

Opinion 4.)

On January 27, 2004, Odom timely appealed her removal to the Merit

Systems Protection Board ("MSPB"), which had jurisdiction because the removal

was based on unacceptable performance.  (M.S.P.B. Opinion 1.)  Odom requested

a hearing, which was held in Birmingham, Alabama, on April 20 and 21, 2004,

with telephonic testimony continuing on April 26, 2004.  (Id.)  The MSPB

affirmed the SSA's action to remove Odom in an initial decision issued on May 28,

2004, which became final on July 2, 2004.  (M.S.P.B. Opinion 1; Compl. ¶ 3.)

Odom maintains in her complaint that she was not the only SSA employee

with a disability who was discriminated against by the agency.  (Compl. ¶¶ 36-42.)

Plaintiff offers the names and factual scenarios of at least eight other individuals

with visually identifiable disabilities such as hers that were allegedly

discriminated against by the Southeast Program Center of the SSA because they

were not accommodated and/or suffered an adverse employment action.  (Odom

Dep. at 84-94; Jones Aff. ¶¶ 19-26.)[14]

## IV. Applicable Substantive Law and Analysis

---

[14] On August 30, 2005, defendant filed a motion to strike (doc. #23) portions of Irene
Jones' affidavit relating to other disabled SSA employees.  Because plaintiff failed to make out a
prima facie case on her disparate treatment claim, this evidence was not considered and the
motion is **MOOT**.

Plaintiff's complaint alleges that defendant (1) failed to reasonably accommodate her and treated her disparately in violation of the Rehabilitation Act and (2) retaliated against her and wrongfully terminated her in violation of Title VII.  Defendant's motion for summary judgment, as amplified in its brief in support thereof, asserts that (1) plaintiff cannot establish a prima facie case of disparate treatment based upon her alleged learning disability and/or cannot show evidence of pretext, (2) plaintiff has not shown that defendant failed to accommodate her physical disability, (3) plaintiff was not otherwise qualified for her position, (4) plaintiff failed to exhaust her administrative remedies regarding her retaliation claim, (5) plaintiff cannot establish a prima facie case of retaliation and/or cannot show evidence of pretext, and (6) the MSPB's decision upholding plaintiff's removal was not arbitrary or capricious.  (See generally Def.'s Mem. Supp. Mot. Summ. J.)

It is well settled that "[a]ny employee . . . adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board may obtain judicial review of the order or decision."  5 U.S.C. § 7703(a)(1).  As a general matter, the Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals from the MSPB, with the exception of discrimination claims, which the plaintiff may appeal to a U.S. District Court.  5 U.S.C. § 7703(b); Kelliher v. Veneman,

313 F.3d 1270, 1274 (11th Cir. 2002).  In "mixed" cases, where discrimination claims and other claims were both presented before the MSPB, "the appeals are not bifurcated; instead, the district court has jurisdiction to review both the discrimination and non-discrimination claims."  Kelliher, 313 F.3d at 1274.  The discrimination claims are subject to de novo review by the district court, while the non-discrimination claims are subject to the general standard of review outlined in 5 U.S.C. § 7703(c).  Id. at 1274-75.  This court reviews each of plaintiff's claims separately using the appropriate standard of review.

## A. Plaintiff's Failure to Accommodate Claim

"The Rehabilitation Act (the Act) prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability."  Sutton v. Lader, 185 F.3d 1203, 1207 (11th Cir. 1999); see also 29 U.S.C. § 791.  Rehabilitation Act claims are analyzed under the same standard as Americans with Disabilities Act ("ADA") claims.  Sutton, 185 F.3d at 1208 n.5. To establish a prima facie case of employment discrimination under the Rehabilitation Act, a plaintiff must show that (1) she has a disability, as that term is defined under the Rehabilitation Act, (2) she is otherwise qualified for the position, and (3) she was subjected to unlawful discrimination as a result of her disability.  Id. at 1207.

16

Thus, in order to bring any claim under the Rehabilitation Act, a plaintiff must first show that she has a disability, as that term is defined under the Act.  The Act defines an "individual with a disability" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such impairment; or (iii) is regarded as having such an impairment."  29 U.S.C. § 705(20)(B); <u>see also</u> <u>Sutton</u>, 185 F.3d at 1208.  Determining whether a plaintiff is an individual with a disability for purposes of the Rehabilitation Act requires a three-part analysis.  <u>Rossbach v. City of Miami</u>, 371 F.3d 1354, 1357 (11th Cir. 2004).  First, the plaintiff must prove that she is actually impaired.  <u>Id.</u>  The Rehabilitation Act regulations define a physical or mental impairment as

> (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

45C.F.R. § 84.3(j)(2)(i).

However, merely being diagnosed as having a physical or mental impairment is not enough to qualify as an "individual with a disability."  <u>Toyota Motor Mfg.,</u>

Inc. v. Williams, 534 U.S. 184, 195 (2002).  Next, the court must consider the

major life activity that the plaintiff claims has been substantially limited and

determine whether it is a major life activity within the meaning of the

Rehabilitation Act.  Id.  The regulations define a "major life activity" as a

"function[] such as caring for oneself, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning, and working."  45 C.F.R. § 84.3(j)(2)(ii).

This list is not exclusive; an activity may still constitute a "major life activity" for

purposes of the Rehabilitation Act if a court determines that it is "significant" in a

person's everyday life.  Rossbach, 371 F.3d at 1357; see also Bragdon v. Abbott,

524 U.S. 624, 638-39 (1998).  Finally, the court must determine whether the

plaintiff's impairment "substantially limits" her identified major life activity.

Rossbach, 371 F.3d at 1357.  "Substantially limits" is defined in the Equal

Employment Opportunity Commission ("EEOC") regulations[15] as being either

unable to perform or severely restricted in performing a major life activity as

compared to the average person in the general population.  29 C.F.R. §

1630.2(j)(1).  Determining whether an individual is substantially limited in a major

---

[15] While the EEOC was not explicitly given the authority to issue regulations interpreting the term "disability," the agency has done so, and both the Supreme Court and the 11th Circuit have found those regulations to be instructive in interpreting the meaning of "individual with a disability" under the ADA and the Rehabilitation Act.  See, e.g., Toyota, 534 U.S. at 193-94; Rossbach, 371 F.3d at 1357 n.4; Hilburn v. Murata Elec. N. Am., 181 F.3d 1220, 1226-27 (11th Cir. 1999).

life activity is a fact-intensive inquiry, and a court should consider several factors, including "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).  <u>Toyota</u>, 534 U.S. at 198-99.  With regard to the major life activity of working, the term "substantially limits" means that an individual is

> significantly restricted in the ability to perform either a class of jobs
> or a broad range of jobs in various classes as compared to the average
> person having comparable training, skills and abilities.  The inability
> to perform a single, particular job does not constitute a substantial
> limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3).

## 1. Plaintiff's Physical Disability

In the instant case, plaintiff claims to have both a physical and a mental disability as defined by the Rehabilitation Act.  It is clear to the court, and defendant does not dispute, that plaintiff has a qualifying physical disability.  She has been diagnosed with a physical impairment, spastic paraparesis, which requires that she use a wheelchair at all times and sometimes causes her to have difficulties using her arms and hands.  Plaintiff's dependence on a wheelchair for her mobility indicates that she is substantially limited in the major life activity of

walking.  It is not clear, however, whether plaintiff's physical disability

substantially limits other major life activities, such as performing manual tasks or

working.

Although she requested an accommodation (voice recognition software) for

employees who cannot effectively use their hands and arms, plaintiff does not

claim that her physical impairment substantially limits a major life activity related

to the use of her arms and hands, such as performing manual tasks.  Even if

plaintiff had set forth such a claim, however, she does not appear to be

substantially limited in the major life activity of performing manual tasks.  In order

to be substantially limited in performing manual tasks, such as typing on a

computer and using a mouse, plaintiff would need to show that her physical

impairment "prevents or severely restricts [her] from doing activities that are of

central importance to most people's daily lives."  Toyota, 534 U.S. at 198.  "The

impairment's impact must also be permanent or long term" in order for the plaintiff

to be substantially limited in the major life activity of performing manual tasks.

Id.  In the instant case, plaintiff cannot show that she was prevented or severely

restricted from performing activities that are of central importance to most

people's daily lives, such as tending to personal hygiene tasks (bathing, brushing

one's teeth) and performing household chores.  See id. at 201-02.  She could not

even show that she was severely restricted in her use of a computer keyboard and mouse, the very tasks for which she was requesting accommodation.  On the contrary, the evidence indicates that plaintiff was rather adept at using a computer for work-related tasks and that she often used it for other tasks, such as surfing the internet and playing video games.  (Locke Dep. at 76-77; Odom Dep. at 105; Powers Dep. at 55; Admin. R. at 93, 95, 138, 178, 190, 193.)[16]  The evidence also shows that plaintiff has no problems using her hands and arms for other tasks, including playing musical instruments such as the trumpet, the harmonica, the recorder, and the drums and performing office tasks at her former job such as entering data into the computer, answering phones, and filing.  (Odom Dep. at 103-04, 106; Admin. R. at 363-64.)  Because plaintiff has not alleged, and cannot establish, that her physical impairment substantially limits her performance of manual tasks such as typing and manipulating a computer mouse, the court will not consider her failure to accommodate claim based on the SSA's refusal to provide her with voice recognition software.  The court will consider, however, plaintiff's claims that are based on her physical impairment that substantially limits

---

[16] The mentors who commented on Odom's superior computer skills undoubtedly meant that she used her computer effectively in her job, not that she was good at typing and manipulating a mouse.  However, the fact that her mentors noticed that she was adept at using the computer to work on her cases means that she was, in fact, using the computer effectively, which indicates she was typing on it and using the mouse.

the major life activity of walking.

**2. Plaintiff's Learning Disability**

Plaintiff also claims that she has a mental impairment that substantially limits a major life activity.  The Rehabilitation Act prohibits discrimination on the basis of mental impairments in the same manner that it prohibits discrimination on the basis of physical impairments.  See 45 C.F.R. § 84.3(j)(2)(i).  "[S]pecific learning disabilities" are expressly included in the definition of a physical or mental impairment.  Id.  Plaintiff has been diagnosed by a clinical psychologist as having a mental impairment in the form of a "significant learning disability in Math."  (Admin. R. at 63.)  However, as the court previously noted, merely being diagnosed with an impairment is not enough to establish that plaintiff has a qualifying disability under the Rehabilitation Act.  Toyota, 534 U.S. at 195. Plaintiff must also show that her impairment substantially limits her ability to perform one or more major life activities.  Plaintiff has failed to make this showing in the instant case.

Plaintiff claims that her learning disability substantially limits two major life activities:  learning and working.  As evidence that she is substantially limited in the major life activity of learning, plaintiff offers her own "professional opinion"

that she has a learning disability, a July 2003 report from a clinical psychologist describing her limitations in the area of numerical operations, and her numerous negative progress reports containing comments from her managers and mentors that she had difficulty with computations and rates.  Plaintiff's evidence does indicate that her mathematical skills are limited.  According to her psychologist's report, she performs numerical operations on about a fifth or sixth grade level.[17] However, the evidence does not indicate that she is unable to perform numerical functions or that she is *severely* limited in her ability to do so compared to the general population.  Many people struggle with mathematics and rely exclusively on calculators or computers for even the simplest calculations.  The report from her psychologist indicated that Odom could largely compensate for her learning disability by using a calculator and by learning job-specific math skills, which she initially learned in her formal training class and was repeatedly reminded of during the approximately three years that she was on 100 percent mentor review. (Admin. R. at 65.)  Nowhere in his report did plaintiff's psychologist indicate that she was incapable to learning job-related math skills or that she had difficulty learning at all.  The report merely indicates that she has a diminished ability to perform numerical operations.  It does not state that she is incapable of learning

---

[17] The report indicates that plaintiff performed at a grade level of 5.6.  (Admin. R. at 65.)

anything, including skills related to math, even though she may take longer to make calculations or require the assistance of a calculator or computer when dealing with subjects related to mathematics.  Her overall ability to learn is evidenced by the fact that she holds both a bachelor's and a master's degree from the University of Alabama.  This is significantly more schooling than the average person achieves, which demonstrates that she has the capacity to learn and complete the required curriculum at a university.  In addition, while the skill set may have differed from that necessary to perform the claims authorizer job, plaintiff was apparently able to grasp the mathematical skills necessary to compute premium amounts for the insurance company she worked for from 1997 until 1999.  (Odom Dep. at 106.)  While Odom has demonstrated that she has a diminished ability to perform mathematical operations, she has not established that her diminished ability translates into a substantial limitation in the major life activity of learning.

Plaintiff has also not established that she is substantially limited in the major life activity of working.  As mentioned *supra*, to prove that she is substantially limited in the major life activity of working, plaintiff must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having

comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i); see also

Carruthers v. BSA Advertising, 357 F.3d 1213, 1216 (11th Cir. 2004) (adopting

EEOC regulation 29 C.F.R. § 1630.2(j)(3)(i)).  A showing that she is unable to

perform a "single, particular job" is insufficient to establish that she is

substantially limited in the major life activity of working.  Id.  A plaintiff's

impairment must preclude her from more than one type of job, "even if the job

foreclosed is [her] job of choice."  Rossbach, 371 at 1359; see also Cash v. Smith,

231 F.3d 1301, 1306 (11th Cir. 2000).  Further, "[i]f jobs utilizing an individual's

skills . . . are available, [she] is not precluded from a substantial class of jobs."

Sutton v. Lader, 527 U.S. 471, 492 (1999).  "Similarly, if a host of different types

of jobs are available, one is not precluded from a broad range of jobs."  Id.

Plaintiff contends that she is substantially limited in her ability to perform

all jobs that require mental math skills, such as jobs requiring measurement and

the use of time tables as well as bookkeeping and accounting jobs.  Her

psychologist's report indicates that her diminished ability to perform numerical

operations would affect her ability to perform such jobs, and she would require

special accommodations to perform them successfully.  (Admin. R. at 65.)  First of

all, plaintiff must show that she is significantly restricted in her ability to perform

certain jobs compared to the average person with training, skills, and abilities

*comparable to hers*.  Some of the jobs the psychologist's report states that Odom would have difficulty performing are not jobs that she has the training, skills, and ability to perform.  The report includes examples of jobs dealing with measurements such as carpet layers, lawnkeepers, maintenance people, and cooks and jobs dealing with time tables such as route salespeople.  (Admin. R. at 65.) The average person performing these jobs does not have training, skills, and abilities comparable to Odom's because nothing in the evidence indicates that Odom has the skills necessary to perform these jobs despite her diminished ability to perform numerical operations.  Thus, the potential difficulties she would have with the math required for these jobs is irrelevant.

The other jobs plaintiff alleges she is substantially limited in performing - office jobs involving bookkeeping and accounting skills - are jobs that she does have the training, skills, and abilities to perform, and her capacity to perform these jobs can be compared to the average person with her training, skills, and abilities. The court recognizes that Odom has alleged a limitation relating to a broad range of jobs.  Many different types of jobs, particularly office jobs, require certain bookkeeping and/or accounting skills.  However, Odom has not established that she is substantially limited in performing that broad range of jobs.  She testified that her "[learning] disability has never affected me in terms of my ability to do my

26

jobs or progress until I came here to the Social Security Administration and the technicalities of that job." (Odom Dep. at 128.) Odom apparently never had difficulty performing the simple mathematical tasks required for her two previous positions - an office assistant at an insurance agency and a classroom teacher. As an office assistant, she was required to calculate insurance premiums with the help of a computer. As a teacher, she graded papers, calculated her students' grades, and kept track of their averages. Odom was able to accomplish these types of simple mathematical tasks, particularly if she had the assistance of a computer or a calculator. Similarly, Odom was qualified for, and likely would have been able to perform, some of the less technical jobs within the SSA, including the claims representative trainee ("CRT") position. In fact, Odom initially requested and accepted a 90-day provisional assignment to a CRT position and then decided to stay in her CAT position instead.[18] Nothing in the evidence indicates that Odom would be limited in performing any job except for the very specific, technical positions of claims authorizer and similar technical jobs at the SSA. It appears that the particular job of claims authorizer was just too complicated for Odom, perhaps owing to her diminished ability to perform numerical operations.

---

[18] The CRT position is a GS-5 position on the pay scale, which means Odom would have earned less than she did in her CAT position, which is a GS-7 on the pay scale. Odom understood this when she requested reassignment. (Admin. R. at 172.)

However, her showing that she was not able to perform the responsibilities of this particular position is insufficient to establish that she is substantially limited in the major life activity of working.  Odom's diminished ability to perform numerical operations appears to be the type of limiting, but not *substantially* limiting, impairment that would allow an employer to permissibly determine that she is "less than ideally suited for a [particular] job."  Sutton, 527 U.S. at 491.

### 3. Plaintiff's Qualifications and Accommodations

In order to establish a prima facie case of discrimination under the Rehabilitation Act, plaintiff must not only show she is an individual with a disability, she must also show that she was otherwise qualified for her position as a claims authorizer.  Sutton, 185 F.3d at 1207.  To be "otherwise qualified," a plaintiff must show that she "can perform 'the essential functions of the job in question with or without reasonable accommodation.'"  Id. at 1210 (quoting 29 C.F.R. § 1630.2(m)); see also Wood v. Green, 323 F.3d 1309, 1312 (11th Cir. 2003).  "Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires."  Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1258 (11th Cir. 2001) (quoting 29 C.F.R. § 1630.2(n)(1)).  Determining what those duties are is a fact-intensive inquiry conducted on a case-by-case basis.  Id.  Job descriptions written by the employer are considered

evidence of the essential functions.  Id.; Earl v. Mervyns, Inc., 207 F.3d 1361,

1365 (11th Cir. 2000).  Essential functions are often the most basic components of

a job, such as coming to work or being on time.  See, e.g., Lucas, 257 F.3d at 1259

(being able to perform physical labor is essential function of job on packing line);

Earl, 207 F.3d at 1366 (punctuality was an essential function of the job of an area

coordinator who worked on shifts); Jackson v. Veterans Admin., 22 F.3d 277, 279

(11th Cir. 1994) (regular attendance was an essential function of a housekeeping

aide job because it must be done at the same time each day at a particular

location).

        In the instant case, plaintiff and defendant seem to agree that the essential

functions of plaintiff's position are outlined in the form entitled "Technical Trainee

Guidelines."  (Admin. R. at 231; see Def.'s Br. Supp. Summ. J. 27; Pl.'s Opp'n 41.)

These guidelines are generally applied to the position description for a claims

authorizer who has completed the training phase.[19]  Essentially, the claims

authorizer is responsible for reviewing and authorizing all claims for Social

Security benefits, which includes evaluating facts and evidence and making

_____

[19] One of the issues before the M.S.P.B. was whether Odom was apprised of the "critical
elements" of her job as required by 5 U.S.C. § 4302(b)(1).  See generally M.S.P.B. Opinion.
This court need not address this issue and will only use the "critical elements" found in the
position description for a claims authorizer insofar as they are instructive in determining the
essential functions of plaintiff's claims authorizer trainee position.

determinations about issues involved in the claims.  (Locke Dep. Ex. 2.)  As a claims authorizer trainee, Odom was required to strive toward reaching the position of full claims authorizer by (1) increasing independence in her casework; (2) increasing production, accuracy, and complexity of casework; (3) achieving a level of proficiency that indicates she will be able to process a representative share of work with an acceptable degree of accuracy, considering her level of experience; (4) using her time wisely; and (5) making reasonable progress from month to month.  (Admin. R. at 231.)

While the evidence does not overwhelmingly indicate that plaintiff is qualified for her position, she has presented enough evidence to create an issue of fact as to whether she was "otherwise qualified."  There were several months in which her accuracy and/or her production improved, and she showed significant improvement for a three-month period in 2002 while being mentored by James Cockrell and after receiving one-on-one training in certain areas.  (Admin. R. at 55, 72, 87, 94, 137, 142, 148, 156, 179, 183, 193, 201, 207, 212.)  In addition, during the period she was being mentored by Cockrell, her accuracy and production were well above the suggested benchmark levels for a claims

authorizer trainee:[20] she processed 165 cases with 90.01 percent accuracy in June 2002, 176 cases with 94.32 percent accuracy in July 2002, and 127 cases with 87.4 percent accuracy in August 2002. (Admin. R. at 137, 142, 148, 231.) While her progress reports indicate that Odom did not excel in her position as a claims authorizer trainee, she has at least demonstrated that she is capable of performing the essential functions of the job with or without reasonable accommodation. Whether she continually performed at a satisfactory level is a separate question that goes to whether the SSA terminated her for a legitimate, non-discriminatory reason. At the summary judgment stage, plaintiff has presented enough evidence to establish that she was "otherwise qualified" for purposes of her prima facie case.

Once a plaintiff establishes that she is (1) an individual with a disability and (2) otherwise qualified for her position, she must show that she was subjected to unlawful discrimination as a result of her disability. Sutton, 185 F.3d at 1207. One of the ways in which an employer can unlawfully discriminate against an employee on the basis of her disability is by failing to provide "reasonable accommodations" for her. 29 C.F.R. § 1630.9(a); see also Lucas, 257 F.3d at

---

[20] The suggested indicators that a trainee is supposed to reach, which the SSA stresses are not required to be successful in the position, are 10 cases per day with 83 percent accuracy. (Admin. R. at 231; Locke Dep. at 25.)

1255.  However, an employer may be excused from providing reasonable
accommodations if it "would impose an undue hardship on the operation of its
business."  29 C.F.R. § 1630.9(a).  An accommodation is "reasonable" if it allows
an individual with a disability to perform the essential functions of her job.  <u>Lucas</u>,
257 F.3d at 1255.  Plaintiff bears the burden of identifying an accommodation that
would allow her to perform her job duties and of establishing that the identified
accommodation is reasonable.  <u>Willis v. Conopco, Inc.</u>, 108 F.3d 282, 286 (11th
Cir. 1997).  Reasonable accommodations may include "job restructuring, part-time
or modified work schedules, reassignment to a vacant position, acquisition or
modification of equipment or devices, appropriate adjustment or modifications of
examination, training materials or policies, the provision of qualified readers or
interpreters, and other similar accommodations for individuals with disabilities."
42 U.S.C. § 12111(9)(B); <u>see also</u> <u>Lucas</u>, 257 F.3d at 1256; <u>Stewart v. Happy</u>
<u>Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1285 (11th Cir. 1997).  An
individual with a disability is not necessarily entitled to an accommodation of her
choice; she is only entitled to an accommodation that is reasonable.  <u>Stewart</u>, 117
F.3d at 1286.

Plaintiff's requested accommodation is having productive time deducted

from her day to give her extra time to use the restroom.[21]  As a claims authorizer,

plaintiff is expected to have a certain amount of "productive time" each day,

during which she is processing cases.  (See Locke Dep. at 25-26; Odom Dep. at

111-13.)  In her May 8, 2003 request for accommodation, plaintiff explained her

reasons for requesting this accommodation:

> Due to my health condition and inability to move quickly it takes an
> average of twenty minutes each time I have to go to the restroom for
> me to finish and return to my desk.  I have to go an average of 3 times
> during working hours, more than 3 times if I am ill.  I am not
> completeing [sic] work during this time.  Therefore, I ask that some
> time be taken off of my productive time count each day for this
> purpose.

(Admin. R. at 68.)

The SSA denied Odom's request, stating that it was a personal, not a job-related,

accommodation and that she had not shown how decreasing her productive time

for restroom breaks would enable her to perform the essential functions of her job.

(Admin. R. at 66-67.)

      Both parties appear to be in agreement that increasing the output and

---

[21] The court will not address plaintiff's other requested accommodations because they related to either her learning disability (her request to retake formal training classes and her request to attend vocational training at a rehabilitation center) or her use of her arms (her request for voice recognition software).  As discussed *supra*, neither her learning disability nor her difficulties using her arms qualify as disabilities within the meaning of the Rehabilitation Act.

accuracy of cases is an essential function of plaintiff's position at the SSA.  In

order to do this, she is required, like all other claims authorizer trainees, to log a

certain amount of productive time each day.  Logging the requisite amount of

productive time is no doubt an essential function of the claims authorizer trainee

job.  Allowing plaintiff to deduct time from her productive time would change the

essential functions of her job.  The Rehabilitation Act does not require employers

to make such accommodations:  "[E]mployers are not required to transform the

position into another one by eliminating functions that are essential to the nature

of the job as it exists."  Lucas, 257 F.3d at 1260.  In addition, plaintiff should have

been able to complete all her required productive time with the accommodations

she was already given.  First of all, time in the restroom does not count against any

worker's productive time.  (Locke Dep. at 23.)  Second, plaintiff's work station

was placed as close as possible to the restroom so that it would not take her as

long to get there.  (Admin. R. at 67.)  Third, the time plaintiff spent in the restroom

during the day should not matter because the SSA operates on flex time.  (Odom

Dep. at 114.)  Because they were on flex time, she should have been able to log

the same number of productive hours per day regardless of how long she spent in

the restroom.  Because deducting time from her productive time would amount to

changing the essential functions of her job, plaintiff has not identified a reasonable

34

accommodation, and no issue of material fact exists as to her claim.  Accordingly,
summary judgment is granted with regard to plaintiff's reasonable accommodation
claim.

## B. Plaintiff's Disparate Treatment Claim

The same burden-shifting framework that applies in Title VII cases also
applies under the Rehabilitation Act.  Holifield v. Reno, 115 F.3d 1555, 1561
(11th Cir. 1997); Brandon v. Lockheed Martin Aeronautical Sys., 2005 WL
2420515, at *11 (N.D.Ga. Sept. 29, 2005).  To establish a prima facie case of
disparate treatment , a plaintiff must show that (1) she was a member of a
protected class, (2) she was subjected to an adverse employment action, (3)
similarly situated individuals outside the protected class were treated more
favorably, and (4) she was qualified for the position.  Holifield, 115 F.3d at 1562.

Plaintiff has established that she is a member of a protected class because
her physical disability qualifies her as an individual with a disability within the
meaning of the Rehabilitation Act.  She was also subjected to an adverse
employment action because she was fired from her position at the SSA.  In
addition, as the court has already discussed, plaintiff has at least created a genuine
issue of material fact regarding whether she was "otherwise qualified" for her

position.  Thus, the only remaining element of her prima facie case is whether similarly situated individuals outside the protected class of individuals with disabilities were more favorably treated.

To establish this element of her prima facie case, plaintiff must show that she and the comparator employees "are similarly situated in all relevant aspects," including their job performance and the way in which they were disciplined. Holifield, 115 F.3d at 1562.  If a plaintiff fails to show the existence of similarly situated employees, summary judgment on her disparate treatment claim is appropriate where there is no other evidence of discrimination.  Id.  Defendant maintains that Odom has failed to identify the existence of similarly situated individuals because none of the comparators plaintiff named at the M.S.P.B. hearing were supervised by Geraldine Locke, the manager who made the decision to terminate Odom, and no evidence was presented that the comparators had similar performance problems.  Odom claims that similarly situated trainees in both modules 16 and 9 were treated differently because they were placed on 50 percent review while she remained on 100 percent review despite the fact that she reached the same acceptable performance levels the other employees had reached. (Odom Dep. at 16-19.)  However, she presented no evidence to corroborate this claim, and there is no evidence that the other trainees in her module had similar

36

performance problems (i.e. were placed on PAPs and/or PEPs).[22]

Plaintiff has failed to identify any similarly situated comparators who were treated more favorably than she was.  At her M.S.P.B. hearing, she identified two non-disabled employees, Antonio Roman and Ruben Bonilla, who she claims were treated more favorably than she was.  (M.S.P.B. Opinion 20.)  She claimed that management reassigned them to other positions when their performance was unacceptable and that Roman was allowed to repeat his training class, as she had requested to do.  (Id.)  Plaintiff failed to mention either of these comparators in her complaint or in her deposition, however, and there is no evidence that they had the same supervisors as plaintiff or that they had similar performance problems.  In her deposition, plaintiff testified that Peggy Allen Jones, another employee with a disability, was more favorably treated.  (Odom Dep. at 16-17.)  According to Odom, Jones was placed on 50 percent review and eventually taken off review and promoted to the GS-11 level even though her statistics were lower than Odom's at the point when Odom requested she be taken off 50 percent review.  (Id.)

---

[22] Odom's supervisors at the SSA testified that trainees sometimes remained on review despite reaching the suggested accuracy and production indicators found in the trainee guidelines because each person's work was considered by his or her supervisors on an individual basis. (Powers Dep. at 49-51; Locke Dep. at 26, 54-55.)  Odom remained on review, they claimed, because despite her numbers, other factors, which were permissibly taken into account, indicated that she needed to remain on 100 percent review.  (Powers Dep. at 30-31; Locke Dep. at 78; Admin. R. at 231.)

However, Odom offers no evidence that Jones had similar performance problems (i.e. that she was placed on a PAP or a PEP or that she had statistics similar to those that Odom had outside the window from June through August 2002). Because comparators must be similarly situated in *all relevant aspects*, the fact that she did not have performance problems similar to Odom's means she is not similarly situated and cannot be used as a comparator.  The only other employees Odom identifies - employees with disabilities who also suffered adverse employment actions - were not more favorably treated and thus cannot be used to prove her disparate impact claim.  This sort of anecdotal evidence regarding employees who were treated in a manner similar to plaintiff is appropriately offered to prove a claim that an employer is engaging in a pattern and practice of discrimination, not to prove a disparate impact claim.  See Cooper v. Southern Co., 390 F.3d 695, 716 (11th Cir. 2004) ("The plaintiff can prove that discrimination was the standard operating procedure through a combination of statistics and anecdotes.") (internal quotations omitted).  Plaintiff has not alleged a pattern and practice claim in this case.[23]  Accordingly, plaintiff cannot establish

---

[23]The court notes that if plaintiff had been able to establish a prima facie case, her pattern and practice evidence would have been admissible to show that the SSA's reason for terminating her was pretextual.  See Joseph v. Publix Super Markets, Inc., Nos. 04-12042, 04-13262, 2005 WL 2249887, at *2-3 (11th Cir. Sept. 16, 2005).

this element of her prima facie case and her disparate treatment claim fails.

## C. Plaintiff's Retaliation and Wrongful Termination Claims

In her complaint, plaintiff alleged retaliation and wrongful termination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.  Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin."  See generally 42 U.S.C. § 2000e.  It does not, however, prohibit discrimination on the basis of disability.  Under federal law, disability discrimination is only actionable under the Americans with Disabilities Act, 42 U.S.C. § 12112 et seq. and/or the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.  Because Title VII does not protect against discrimination on the basis of an individual's disability, plaintiff may not bring retaliation and wrongful termination claims under Title VII for such discrimination.  See 42 U.S.C. § 2000e-3.  Therefore, the court is dismissing these claims without prejudice. Plaintiff has ten (10) days to show cause why the court should reinstate these claims.  If plaintiff fails to do so, the claims will be dismissed with prejudice.

## D. The Decision of the M.S.P.B.[24]

---

[24] The court is being very lenient in addressing this issue.  Plaintiff did not appeal the decision of the M.S.P.B. in her complaint.  Therefore, it is not properly before the court. However, because both parties addressed the issue in their summary judgment briefs, the court will address it out of an abundance of caution.

As noted *supra*, although discrimination claims are reviewed de novo, other M.S.P.B. determinations - such as the decision to uphold Odom's termination in this case - "are reviewed on the record and set aside only if the 'agency action, finding or conclusion' is found to be:  '(1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence.'" Kelliher, 313 F.3d at 1274 (quoting 5 U.S.C. § 7703(c)).

In determining whether the M.S.P.B.'s decision was arbitrary or capricious, this court will not substitute its judgment for that of the M.S.P.B. but instead looks at whether the M.S.P.B.'s decision was reasonable and rational.  Kelliher, 313 F.3d at 1276.  The arbitrary or capricious standard of review gives the reviewing court very little latitude, and that court must only "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'"  Id. (quoting N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990)).  In the instant case, the M.S.P.B.'s decision was neither arbitrary nor capricious.  Odom argued before the M.S.P.B. that her PAP and PEP were both illegal because such plans are intended only for employees who fail to meet their critical job elements, and she did not have, or was not

apprised of, any critical job elements as a GS-7 claims authorizer trainee.  (Compl.

¶¶ 21, 28; M.S.P.B. Opinion 6.)  Thus, she did not know the standard against

which her performance was being measured and could not determine whether she

was performing at an acceptable level.  (M.S.P.B. Opinion 6.)   The M.S.P.B.

found, however, that the performance standards, position descriptions, and

guidelines that were given to plaintiff, coupled with the SSA's attempts to counsel

plaintiff regarding her job, were sufficient to meet the "statutory requirements for

validity under 5 U.S.C. § 4302 and were properly communicated to [plaintiff]."

(M.S.P.B. Opinion 14.)  The M.S.P.B. clearly articulated the reasons for its

decision, applying the facts to the relevant law.  The M.S.P.B. considered the

relevant factors and did not make a clear error in its judgment.  Accordingly, its

decision was not arbitrary or capricious.

Plaintiff also appears argue that because the SSA allegedly did not follow

the correct procedure in providing plaintiff with a position description, the

M.S.P.B. decision was made without regard to the appropriate law, rules, or

regulations.  This argument is clearly misplaced and without merit.  The M.S.P.B.

followed all appropriate procedures and applied the appropriate law in rendering

its decision.  Plaintiff wisely does not argue that the M.S.P.B.'s decision was not

supported by substantial evidence.  There is a voluminous record in this case,

which gives a detailed and well-documented account of plaintiff's employment with the SSA and the reasons for her termination.  The M.S.P.B. had access to this evidence and based its decision upon it.  Accordingly, the M.S.P.B.'s decision is affirmed.

In summary, the court finds that there are no material issues of fact as to plaintiff's failure to accommodate and disparate impact claims, and defendant is entitled to judgment as a matter of law on those claims.  Plaintiff's retaliation and wrongful termination claims are dismissed without prejudice according to the terms outlined in this decision.  A separate order will be entered.

Done this 31st day of January 2006.


_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153